

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50322 | **DATE** | 11/18/2002 |
| **CASE TITLE** | | Lester vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff's wife is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | NOV 19 2002 | | |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | | | 11/18/2002 | | |
| sp | courtroom deputy's initials | | date mailed notice | | |
| | | | sp | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# United States District Court
## Northern District of Illinois
### Western Division

WINSTON LESTER

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 01 C 50322

WILLIAM HALTER

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Judgment is entered in favor of the defendant, William Halter and against plaintiff Winston Lester. Plaintiff's motion for summary judgment is denied.

Michael W. Dobbins, Clerk of Court

Date: 11/18/2002

Gale L. Graeff, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| WINSTON LESTER O/B/O | ) | |
| CAROL LESTER | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 50322 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Winston Lester ("Plaintiff") on behalf of his late wife Carol Lester ("Plaintiff's wife") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's wife's application for Disability Insurance Benefits ("DIB") pursuant to Sections 216(i) and 223 of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on November 29, 2001. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### I.    BACKGROUND

Plaintiff's wife filed for DIB on May 3, 1995, alleging disability since December 15, 1993. (Tr.14). Plaintiff's wife's application for benefits was denied on June 19, 1995. (Tr.107). On June 29, 1995, Plaintiff's wife filed a request for reconsideration. (Tr. 111). Her request for reconsideration was denied on July 18, 1995. (Tr.113). Plaintiff's wife then filed a request for a hearing before an Administrative Law Judge ("ALJ") on August 2, 1995. (Tr. 115). Plaintiff's wife

appeared, with counsel, before an ALJ on February 13, 1997. (Tr. 24). On March 26, 1998, Plaintiff's wife, Carol Lester, unfortunately passed away. (Tr.13). After Ms. Lester's death, Plaintiff substituted the late Ms. Lester as the named Plaintiff. (Tr. 9). In a decision dated April 14, 1999, the ALJ found that Plaintiff's wife was not entitled to DIB. (Tr.19). On May 13, 1999, Plaintiff, now Winston Lester, requested a review of the ALJ's decision by the Appeals Council. (Tr. 8). On August 11, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II.   FACTS

Plaintiff's wife was born on March 11, 1948, (Tr. 164), and was forty-eight years old at the time of her February 13, 1997 hearing before the ALJ. (Tr. 24). Plaintiff's wife had completed her education through the tenth grade. (Tr. 121). In 1972 or 1973, Plaintiff's wife attended beautician school and from 1972 to 1987 she operated her own beauty salon out of her house. (Tr. 121).

From 1988 to 1991, Plaintiff's wife worked at Union Hall, a discount department store, owned by the Bagus family. (Tr. 33). When she first began, Plaintiff's wife was a cashier whose job required her to ring up customers merchandise. (Tr. 35). Plaintiff's wife typically worked from 9:00 a.m. to 5:00 p.m. five days a week. (Tr. 36). After working as a cashier, Plaintiff's wife was promoted to supervisor of Union Hall, which required her to watch over the other cashiers, verify charge cards and checks written by customers, make sure all the money was in the safe and accounted for, and assist with stocking merchandise on the shelves. (Tr. 39-40). As a supervisor, Plaintiff's wife continued to work forty hours a week although she was required to vary her hours between the day and night shift. (Tr. 41).

In either July or August 1991, Plaintiff's wife began working as a housekeeper for the Bagus family in addition to working at the Union Hall (*Id.*). Working about three days a week as the

Bagus's housekeeper/nanny, Plaintiff's wife did the laundry, washed the dishes, mopped the floors, took care of the greenhouse, and took care of the Bagus's child, Maxwell. (Tr. 42).

In December 1991, Plaintiff's wife sustained an injury to her left shoulder while doing housework for the Bagus family. (Tr. 176). Plaintiff's wife testified that she hurt her shoulder attempting to lift a large inside storm window. (Tr. 44). However, she continued to work for the Bagus family until December 1993 when she had surgery on her shoulder. (*Id.*). Plaintiff's wife took off six months to recuperate her shoulder and return to work as a housekeeper/nanny for the Bagus family in June 1994. (Tr. 45). However, because of the constant pain associated with her shoulder, Plaintiff's wife only worked until August 26, 1994. (Tr. 46).

On a normal day, Plaintiff's wife testified that she would get up, make her husband's lunch and do the laundry. (Tr. 51). In terms of household chores, Plaintiff's wife testified that she was able to mop and dust around the house and do some vacuuming but she was unable to do any sweeping. (*Id.*). Additionally, she was able to drive not more than 30 miles a day, normally going to the grocery store or the bank. (Tr. 52). Plaintiff's wife also testified that she could dress herself and had no problems with buttons or zippers. (*Id.*).

Regarding her injured arm, Plaintiff's wife testified that she had problems raising her arm above the shoulder. (Tr. 53). She described her arm as "feeling dead" when she attempted to hold it above the shoulder for very long. (*Id.*). According to her testimony, Plaintiff's wife was only able to lift her arm to about shoulder height and no more without weakness and pain. (Tr. 54). However, she did testify that her shoulder was useable from shoulder height down, including being able to pick up objects off the floor. (*Id.*).

Upon being questioned by her attorney, Plaintiff's wife testified that she was unable to brush

and cut her own hair because of her shoulder pain and needed assistance from her husband with most normal daily activities. (Tr. 67). For example, Plaintiff's wife would throw clothes downstairs where the washing machine was located but Plaintiff, her husband, would carry the laundry up the stairs. (*Id*.). Additionally, Plaintiff's wife stated she was only able to work around the house for about thirty minutes before her arm, neck and back begin to bother her. (Tr. 68). Lastly, Plaintiff's wife stated she was unable to cook large meals because she cannot lift the pots and pans, she was unable to shuffle a deck a cards, and she was unable to cross-stitch because she was "unable to hold the loop." (Tr. 70-71).

Vocational expert, Christopher Yep, appeared before the ALJ on January 11, 1998. (Tr. 80). The ALJ directed Mr. Yep to assume the following hypothetical individual: "[t]his person can perform light exertion, as its defined in the regulations; however, this person cannot do any overhead work with the non-dominant left upper extremity, nor climb ladders, ropes, and scaffolds or be exposed to unprotected heights or dangerous moving machinery." (Tr. 87). After presenting the hypothetical, the ALJ asked Mr. Yep whether such a person as described in the hypothetical could "perform any of the titles that you identified that Carol Lester did as part of her vocational history, that is, the cashier/checker position, the supervisor position, the general houseworker job, or the beautician." (*Id*.). Mr. Yep stated that, based on the above mentioned restrictions, the person could perform the supervisor position, but could not perform any of the other mentioned jobs. (*Id*.). Cashiers, Mr. Yep testified, generally require stocking and beauticians generally require a lot of reaching to higher than shoulder level positions. (Tr. 87-88).

Plaintiff's lawyer then questioned Mr. Yep. Plaintiff's lawyer first started by asking Mr. Yep whether Plaintiff's wife could still perform past jobs, such as a supervisor, if she were only able to

4

lift not more than three pounds frequently with her left arm. (Tr. 89). Mr. Yep stated that Plaintiff's wife would still be able to work as a supervisor even with a three pound limitation on her left arm. (Tr. 90). Plaintiff's lawyer then asked Mr. Yep if Plaintiff's wife could still perform past jobs if she were only able to lift not more than three pounds occasionally with her left arm. (*Id.*). Mr. Yep stated that changing her ability to occasionally would start restricting her ability to perform her past jobs. (*Id.*).

After addressing Plaintiff's wife's ability to perform past jobs, Plaintiff's lawyer began questioning Mr. Yep about Plaintiff's wife's residual functional capacity ("RFC"). (Tr. 93). The ALJ instructed Mr. Yep to use the RFC limitations discussed above with the additional limitation that the person can not lift more than three pounds occasionally with her left hand. (*Id.*). Mr. Yep stated that a person with the above mentioned limitations could still perform jobs such as a telephone solicitor (10, 707 jobs in Illinois) or a telephone quotation clerk (43, 816 jobs in Illinois) (Tr. 93-94).

Plaintiff's lawyer again addressed another hypothetical to Mr. Yep, this time limiting the hypothetical to include that the individual could not perform repetitious activities regardless of weight for longer than 30 minutes at a time and then required 30 minutes of rest. (Tr. 94). Mr. Yep stated that with such limitations the person could not be a telephone solicitor or a telephone quotation clerk because of the required keypunching with those jobs, but Mr. Yep nonetheless stated that the person could still perform work as a sales clerk that did not include stocking (172, 013 jobs in Illinois) and some customer service work (19, 313 jobs in Illinois). (Tr. 95). However, Mr. Yep noted because of Plaintiff's wife's inability to stock or lift with those jobs, the actual number of jobs available in Illinois would be reduced by 25%. (Tr. 97).

## III.   **MEDICAL HISTORY**

Plaintiff's wife testified that she hurt her left arm attempting to lift a large inside storm window. (Tr. 44). This incident apparently took place in December 1991. (Tr. 176). The earliest medical report accessible to the Magistrate Judge is dated June 9, 1992 but it references another doctor who had been apparently following Plaintiff's wife's progress. (Tr. 154). However, as just stated, the medical record is void of any report prior to June 9, 1992 and the Magistrate Judge must start from the earliest report on record.

On June 9, 1992, Plaintiff's wife saw Frederick Dietz[1] regarding her left shoulder pain, fatigue and foot pain. (*Id.*). The report indicated that Plaintiff's wife had been treated by Dr. Breck for several months because of left shoulder discomfort, but medications such as Voltaren and Naprosyn had not been helpful. (*Id.*). Mr. Dietz indicated that Plaintiff's wife's pain had increased in her left shoulder over the last couple months and that she had great difficulty working. (*Id.*). Mr. Dietz's report further indicated that he injected Plaintiff's wife's left shoulder joint (left subacromial bursa), on June 9, 1992, with a Celestone-Aristospan-Lidocaine combination. (*Id.*).

On June 20, 1992, Plaintiff's wife saw Walt Rebman, P.T. (Tr. 149). Mr. Rebman indicated in his report that Plaintiff's wife has had an increase in shoulder pain, and that even though Plaintiff's wife did have a long period of rest for the shoulder because of a surgical procedure[2], as

---

[1] It should be noted that throughout the medical record, many reports are not signed and do not indicate who wrote them. Additionally, when possible, the Magistrate Judge will include the name of the person who wrote the report but may not be able to include what position or title that person holds (i.e. doctor, physical therapist). Again, this is because many of the reports in Plaintiff's wife's medical record do not contain such information and the Magistrate Judge must use only what is before him.

[2] There is no report in the medical record that indicates any surgical procedure after Plaintiff's wife's December 1991 injury of her shoulder and prior to June 9, 1992.

soon as she tried to do anything with her shoulder, there were still marked symptoms. (*Id.*). Mr. Rebman performed a full evaluation of Plaintiff's wife's arm movements and indicated:

> [h]er posture shows marked round shouldering. Right upper extremity for comparison showed flexion 185, abduction 180, external rotation 100, internal rotation 85. There was Grade III general mobility. Cervical clearing exam shows rotation to the right to be 90 and pain free, to the left was 85 with pain shooting into the left shoulder. Forward and backward bending both produced pain across the posterior aspect of the shoulder into the upper arm. Side bending to the left markedly produced shoulder pain. Side bending right did not. Neurologically, however, there were no deficits. The left shoulder was markedly restricted with flexion being 90, abduction 70, external rotation 45, internal rotation was only 60 and this was in the anatomical position. In an abducted position, internal rotation was no better than 20 degrees. Joint play was Grade II. The movement seems to be markedly painful and is articular, except for the aching across the back of the shoulder, which might be coming from the neck.

(*Id.*). Mr. Rebman started Plaintiff's wife on an Ion Transfer with Decadron to the left shoulder followed by shoulder mobilization. (*Id.*).

Three days later, Plaintiff's wife again saw Mr. Rebman who indicated that Plaintiff's wife's shoulder persists in hurting but she does demonstrate 135 degrees of flexion, 100 degree of abduction, 60 degrees of external rotation and 15 degrees of internal rotation. Mr. Rebman recommended that Plaintiff's wife continue with the Ion Transfer with Decadron. (*Id.*). However, as of June 30, 1992, Mr. Rebman indicated Plaintiff's wife noted no significant change in her shoulder pain. Mr. Rebman recommended changing the Ion Transfer over to the anterior capsule. (Tr. 148).

On July 10, 1992, Plaintiff's wife again saw Dietz. (Tr. 153). Dietz indicated Plaintiff's wife's problems as of that date were: persistent low back pain, chronic stress aggravated foot pain,

nonrestorative sleep disorder, early onset osteoarthritis in hands and feet, Raynaud's phenomena, seizure disorder, rotator cuff dysfunction left shoulder, and possible cervical radiculopathy. (*Id.*). Dietz further indicated that Plaintiff's wife is still having stiffness in her shoulder, "but improving with home exercise. Greatly helped by cervical traction temporarily from Walt Rebman, and doing ultrasound and cervical traction on a regular basis twice weekly." (*Id.*). Mr. Dietz reported that Plaintiff's wife's physical examination revealed some improvement in shoulder motion and in decreased localized tenderness but she still had problems with strength in left arm extension. (*Id.*). Mr. Dietz recommended that Plaintiff's wife restart Voltaren 75mg twice a day and continue physical therapy with Mr. Rebman. (*Id.*).

Plaintiff's wife saw Mr. Rebman on July 13, 1992. (Tr. 147). Mr. Rebman indicated that Plaintiff's wife could flex her shoulder approximately 150 degrees now and that she experienced pain at the extremes of movements but it is dramatically better. (*Id.*). However, on July 16, 1992, Mr. Rebman reported that it appears once the injection wore off, Plaintiff's wife's "steadily went downhill." (Tr. 146). Mr. Rebman also indicated "[f]or a while prior to last Friday the patient seems to be very steadily improving, but this is no longer the case." (*Id.*). Mr. Rebman recommended ceasing physical therapy until Plaintiff's wife speak to her medical doctor.

On August 17, 1992, Plaintiff's wife saw Dr. Jeffrey Behr. Dr. Behr reported Plaintiff's wife has developed an adhesive capsulitis and a frozen left shoulder. (Tr. 204). Dr. Behr injected Plaintiff's wife's shoulder in order to get some improvement in her range of motion. (*Id.*). Dr. Behr also indicated it may be necessary to consider manipulation of her shoulder as she does have quite restrictive external rotation of only about 10 degrees, abduction of 90 degrees, and forward flexion of 90 degrees. (*Id.*). Plaintiff's wife saw Dr. Behr one week later as requested by Dr. Behr. (*Id.*).

8

Dr. Behr indicated that Plaintiff's wife's shoulder motion had improved following the injection but she still had obvious capsulitis. (*Id.*). Dr. Behr recommended Plaintiff's wife probably needs a medication or anesthetic reinfection plus hospitalization to put her in a CPM machine and start her on therapy. (*Id.*).

On September 11, 1992, Plaintiff's wife was admitted to the Rockford Memorial Hospital for manipulation and injection of left shoulder, both surgical procedures. (Tr. 203). Three days later, Dr. Behr noted Plaintiff's wife had regained almost full functional range of movement as a result of the manipulation. (*Id.*). Also on September 14, 1992, Mr. Rebman saw Plaintiff's wife. (Tr. 143). Mr. Rebman reported that Plaintiff's wife now demonstrates "rather marked improvement. She's showing 170 degrees of flexion, 170 degrees of abduction, 60 degrees of external rotation and 50 degrees of internal rotation." (*Id.*).

On September 15, 1992, Doug Ross, P.T., reported that there is residual tightness of the anterior and posterior joint structures of Plaintiff's wife. (Tr. 144). However, Mr. Ross also reported that functionally Plaintiff's wife has a range of motion that is within 10 degrees of normal. (*Id.*). On September 16, 1992, Mr. Rebman reported that Plaintiff's wife is implementing a much more extensive exercise program as part of her physical therapy including upper cycle, pull downs, pec deck, biceps/triceps and military press. (Tr. 146). Three days later, on September 19, 1992, Mr. Rebman indicated in his report that Plaintiff's wife is somewhat sorer than she has been but her movement of her shoulder is dramatically better than before the manipulation. (Tr. 144). Finally, on September 30, 1992, Mr. Ross reported that Plaintiff's wife had completed her recommended physical therapy for her post-surgery shoulder. (Tr. 143).

Plaintiff's wife returned to see Dr. Behr on October 19, 1992. (Tr. 203). Dr. Behr reported

Plaintiff's wife was experiencing a lot of impingement type pain with forward flexion and internal rotation or motion. (*Id.*). Dr. Behr recommended Plaintiff's wife start taking Medrol Dosepak. (*Id.*). On October 26, 1992 Plaintiff's wife again saw Dr. Behr. (Tr. 202). Dr. Behr indicated that Plaintiff's wife's left shoulder impingement continues to give her a problem. (*Id.*). On this date, Plaintiff's wife again received an injection in her left shoulder and subacromial space, reportedly giving Plaintiff's wife some early relief. (*Id.*). Plaintiff's wife's pain associated with her left arm was reproduced more with forward flexion than extension, radiating down her leg but not below her knee. (*Id.*). However, on November 2, 1992, Dr. Behr reported Plaintiff's wife's shoulder had improved following the injection but there was still some limitation of external rotation and some weakness of her rotator cuff muscles. (Tr. 203).

Plaintiff's wife did not see anybody again until March 17, 1993 when she again saw Dr. Behr. (Tr. 204). On this date, Dr. Behr again injected her shoulder hoping to reduce the pain. (*Id.*). A few weeks later, on April 8, 1993, Dr. Behr reported that Plaintiff's wife did show some improvement from the March injection but in returning to work and using the shoulder in everyday activities she had a rapid recurrence of her impingement. (*Id.*). Dr. Behr started Plaintiff's wife on some Dolobid and recommended isometric exercises. (*Id.*). A couple of weeks later, on April 29, 1993, Dr. Behr reported that Plaintiff's wife's shoulder had improved about 50% or more but she still experiences impingement with forward flexion and internal rotation. (Tr. 200). Additionally, Dr. Behr noted the Dolobid appeared to be working. (*Id.*). About one month later, on May 20, 1993, Plaintiff's wife received her third shoulder injection. (*Id.*). Dr. Behr indicated that this should be her last injection and if she does not experience significant relief then her course of treatment should be reevaluated. (*Id.*). On September 9, 1993, Dr. Behr indicated that Plaintiff's wife probably needed arthroscopic

10

decompression and referred her to see Dr. Rogerson in Madison, Wisconsin. (Tr. 195).

Dr. John S. Rogerson ultimately saw Plaintiff's wife on September 28, 1993. Dr. Rogerson performed a physical exam on this date and reported "poor active abduction." (Tr. 273). Specifically, Dr. Rogerson reported the following:

> [Plaintiff's wife] can only bring her arm up to about 120 degrees of abduction and has pain. With flexion she can come to about 140 degrees. Passively I can get her up to 175 degrees but she does have pain deep in the shoulder. Her internal rotation is to about L-5 and causes some discomfort, although only moderate. External rotation demonstrates some restriction but this again appears to be more active than passive. Subluxation test appears to be negative. Her impingement maneuvers show pain with straight flexion, abduction and external rotation and flexion and internal rotation. [Plaintiff's wife] does seem to have some weakness of the supraspinauts on the left compared to the right.

(Id.). Dr. Rogerson noted that he was concerned that Plaintiff's wife may have a rotator cuff tear and recommended an Arthogram be taken of Plaintiff's wife's left shoulder. (Id.). Dr. Rogerson indicated that if Plaintiff's wife did have a rotator cuff tear then she would need to have an arthroscopic decompression and a rotator cuff repair but if rotator cuff repair was not necessary then a decompression would be an excellent operation for her. (Id.).

On October 18, 1993, Dr. Behr took an Arthrogram of Plaintiff's wife's left shoulder. (Tr. 198). The Arhrogram, Dr. Behr reported, did not demonstrate evidence of a torn rotator cuff. (Id.). Rather, it appeared Plaintiff's wife had a large subacromial spur, which could possibly be cured with a subacromial decompression. (Id.). Dr. Rogerson, using arthrosporic techniques, performed the procedure. (Id.).

On October 26 or 28, 1993, Dr. Rogerson again saw Plaintiff's wife. (Tr. 272). Although

Plaintiff's wife's Arthrogram came up negative, Dr. Rogerson noted that he was concerned about her AC joint and ordered an x-ray be taken of the AC joint with 15 degree cephalad direction. (*Id.*). The x-ray, Dr. Rogerson reported, indicated a very slight decrease in joint space on the left AC joint and a very small amount of osteopenia just inside the articular surface. (*Id.*). After examining the x-ray, Dr. Rogerson indicated that he would recommend doing a Mumford procedure along with a decompression. (*Id.*). Dr. Rogerson, along with Dr. Behr and Dr. Kosmatka, performed a left shoulder arthroscopy, a arthroscopic subacromial decompression and an arthroscopic distal clavicle excision on Plaintiff's wife's left shoulder on December 15, 1993. (Tr. 270).

On December 30, 1993, Dr. Behr saw Plaintiff's wife for a post-operation evaluation. (Tr.198). Dr. Behr reported that Plaintiff's wife has regained excellent range of motion although still has some discomfort with abduction above 100-110 degrees. Dr. Behr indicated that Plaintiff's wife should be able to regain full 180 degree abduction and forward flexion. Dr. Behr referred Plaintiff's wife to Rockford Physical Therapy for strengthening and conditioning in her shoulder and prescribed her Darvacet. (*Id.*).

On January 25, 1994, Plaintiff's wife began seeing Dr. Rogerson on just about a monthly basis to evaluate her progress after her surgery. On this date, Dr. Rogerson indicated Plaintiff's wife had, essentially, a full range of motion but still some discomfort. (Tr. 269). An outlet x-ray showed excellent decompression as well as a Mumford distal clavicle resection. (*Id.*). About eight weeks after her surgery and one month after her first post-operation visit to Dr. Rogerson, Plaintiff's wife again saw Dr. Rogerson. (*Id.*). Dr. Rogerson indicated that Plaintiff's wife can move her left arm well and that there is no significant crepitation and her pain impingement test is markedly improved. (*Id.*). Plaintiff's wife continued to see Dr. Rogerson on February 17, 1994, March 22, 1994, and May

12

16, 1994. (Tr. 268-269). However, outside of Plaintiff's wife's continued pain in her shoulder, Dr. Rogerson reported nothing new.

On June 6, 1994, Dr. Behr meet with Plaintiff's wife and performed another physical examination. (Tr. 197). Dr. Behr reported that Plaintiff's wife "does indeed have 180 degrees of forward flexion," about 35-40 degrees of external rotation on the left versus 50 degrees on the right. Dr. Behr recommended Plaintiff's wife start warm pool exercises at the local YMCA. (*Id.*). From June 8, 1994 to May 3, 1995, (not everyday) Plaintiff's wife took part in occupational therapy, aquatherapy, and hydrotherapy through the Swedish American Hospital .[3] (Tr. 216- 252).

Plaintiff's wife continued to see both Dr. Rogerson and Dr. Behr on a regular basis. She saw Dr. Rogerson on August 16, 1994 and November 15, 1994. (Tr. 268). Dr. Rogerson, on November15, 1994, recommended that Plaintiff's wife see a neurologist or a neurosurgeon or orthopedist because, although her range of motion had returned to normal, Plaintiff's wife continued to feel discomfort, allegedly because of something in her neck. (*Id.*). Dr. Behr saw Plaintiff's wife on September 9, 1993, (Tr. 195), October 17, 1994, and November 14, 1994. (Tr. 189). Dr. Behr's reports, like Dr. Rogerson's, indicated Plaintiff's wife subjectively feels better but she still has chronic pain and discomfort in her left shoulder. (*Id.*).

On December 21, 1994, Dr. Steven Rodman of Swedish American Hospital, examined Plaintiff's wife's left shoulder and had an MRI done on her left upper extremity. (Tr. 180-181). Dr. Rodman noted that views of the left shoulder show widening of the scromioclavicular joint, but the glenohumeral joint appears normal. (Tr.180). However, the MRI of Plaintiff's wife's left upper

---

[3]The thirty-seven page report, which consists of over one hundred entries, documents Plaintiff's wife's daily activities such as how many laps she swam and how long she remained in the pool.

extremity indicated marked thinning of the rotator cuff and what Dr. Rodman believed to be abnormal signal within the cuff compatible with degeneration and probable tear. (Tr. 181).

On January 25, 1995, Plaintiff's wife had another Arthrogram taken of her left shoulder. (Tr.168). On January 26, 1995, Dr. Behr indicated "we" (report does not indicate who "we"is) went through 42 cervical images and 83 shoulder images on her MRI evaluation and several images on her Arthrogram comparing it to a previous Arthrogram. (Tr. 187). Dr. Behr noted the following:

> [t]here is a small blush in space between the humeral head and the acromion suggestive of present rotator cuff tear that is not present on the Arthrogram done on October 8, 1993. The MRI does not show an obvious tear, there is some suggestion of degenerative changes in the rotator cuff musculature. Cervical MRI show degenerative and mild bulging of discs at C3, C4, C5, C6. There is no theca compression. The patient is having some radiation of her shoulder discomfort up into her neck on the left side. Impression is persistent impingement pain in the left shoulder with radiation of this discomfort up into her neck on the left side. Impression is persistent impingement pain in the left shoulder with radiation of this discomfort into the left cervical area. The patient has been through an extensive pain clinic management program which has helped to improve her range of motion, ... but she is still having some persistent pain and discomfort in her left shoulder girdle/ cervical spine area.

(*Id.*).

On April 3, 1995, Plaintiff's wife saw Dr. Charles Wright, a neurosurgeon at Associated Neurosurgeons of Rockford. (Tr. 275). Dr. Wright performed a physical examination on Plaintiff's wife, at which he noted the following: "[p]ower in the upper extremities on the right is normal. On the left it is notable for perhaps 4+ to 5- weakness involving the left tricep, 5- pronation, 5 to 5- biceps, 5- to 4+ infraspinatus and perhaps 5- grip strength." Dr. Wright reviewed Plaintiff's wife's MRI's and indicated that there is nothing ongoing in her cervical spine which would rise to the level

14

of having surgery. (Tr. 276).

After seeing a neurosurgeon, Plaintiff's wife returned to see Dr. Rogerson on April 18, 1995. (Tr. 267). Dr. Rogerson indicated, that at this point, it appears Plaintiff's wife has probably some intrasubstance rotator cuff degeneration at the time of her impingement and compression and Mumford and has gone on to develop more rotator cuff intrinsic disease. (*Id.*). However, Dr. Rogerson noted that from the inferior and superior surface, he did not notice any tearing in the rotator cuff and thus, did not recommend open rotator cuff repair. (*Id.*). Rather, Dr. Rogerson recommended that Plaintiff's wife not pursue heavy labor in the future but that she should look more into sedentary light duty job situations. (*Id.*).

On recommendation from her attorney in a separate law suit, Plaintiff's wife went to see Dr. Charles Carroll of the Orthopaedic Associates of Chicago. (Tr. 278). Dr. Carroll noted Plaintiff's wife "exhibited full range of motion of the cervical spine with a suggestion of pain with flexion and extension. (Tr. 280). Additionally, Dr. Carroll reported Plaintiff's wife "exhibited 100 degrees of forward flexion in the left shoulder" with passive motion "approximately 120 degrees in each direction. (*Id.*). Most notably, Dr. Carroll reported that he would agree with Dr. Rogerson's assessment that Plaintiff's wife should not go through any additional surgery because Plaintiff's wife's "subjective complaints were greater than the objective findings and there was evidence of some guarding with forward flexion of the shoulder." (*Id.*). Plaintiff's wife, in Dr. Carroll's opinion, has reached the maximum medical improvement and the only recourse is continued home therapy exercises with work that does not require overhead activity. (*Id.*). Dr. Carroll ultimately opined that Plaintiff's wife is not disabled. (Tr. 282).

15

## IV.     **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may

only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process

---

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

18

by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly

relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.  ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that although there was evidence that Plaintiff's wife did work after the alleged onset date as a housekeeper, she only earned $362 per month, and thus, as determined under the code, Plaintiff's wife had not engaged in any substantial gainful activity at any time relevant to his decision issued on April 14, 1999 . (Tr. 14-15).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from a severe impairment.  Specifically, the ALJ found Plaintiff's wife to have the following medically determinable impairment: left shoulder syndrome with a history of adhesive capsulitis with a cervical

syndrome. (Tr. 20).

Substantial evidence exists to support the ALJ's determination that Plaintiff's wife suffered from a severe impairment. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.     Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's wife's impairment does not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 15).  The ALJ found that while the record reflects Plaintiff's wife's complaints of joint pain, there is no evidence that her condition was accompanied by the necessary series of staged surgical procedures within twelve months after onset, required by relevant listing 1.13.[6]  (*Id.*). Additionally, the ALJ found that even considering the combination of Plaintiff's wife's impairments, the level of severity does not equal that contemplated for any of the Appendix 1 impairments.  (*Id.*). As evidence of this, the ALJ cited the reviewing physician for the Illinois Disability Determination Service who found that Plaintiff's wife was not disabled.  (*Id.*).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it.  Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

---

[6]Listing 1.13 states "[s]*oft tissue injuries of an upper or lower extremity* requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.

In performing the analysis for Step Four, the ALJ determined that Plaintiff's wife would be able to perform her past relevant work. (Tr. 15). Before coming to his conclusion, the ALJ went through the medical evidence, Plaintiff's wife's daily activities, and considered the factors described in 20 CFR 404.1529(c)(3) and Social Security Ruling ("SSR") 96-7p. (*Id.*).

In terms of the medical evidence, the ALJ noted that the objective medical evidence does not provide a basis for finding limitations that would warrant the inability of Plaintiff's wife to not be able to perform past relevant work. (*Id.*). Specifically, the ALJ stated in his opinion:

> "[a]fter carefully considering the entire record, including [Plaintiff's wife's] subjective complaints of disabling symptoms and limitations, a finding is warranted that [Plaintiff's wife's] impairments preclude only the following work-related activities: lifting more that 20 pounds occasionally or 10 pounds frequently; reaching overhead with the non-dominant left upper extremity; climbing ropes, scaffolds, and ladders; working near unprotected heights or dangerous moving machinery."

(*Id.*). The ALJ supported his residual functional capacity ("RFC") by thoroughly going through Plaintiff's wife's medical history and laying out her noted progress in terms of flexibility and range of motion. (Tr. 15-17). Plaintiff's wife, although undoubtably suffering pain in her shoulder, exhibited a full range of motion in her cervical spine and increased flexion and abduction throughout her physical therapy. (Tr. 16-17). Lastly, the ALJ noted that the "record does not contain any opinions from treating or examining physicians indicating that [Plaintiff's wife] is disabled or even has limitations greater than those determined in this decision." (Tr. 18).

Plaintiff's wife's daily activities, as noted by the ALJ, "were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 18). Plaintiff's wife reported that she prepares lunch, does laundry, mops, dusts, and although she experiences some

pain when vacuuming, she is still able to do so. (*Id.*). She is able to drive an automobile an average of 30 miles per week (which does not seem like much), but which the ALJ found "implicitly [to] require[] full use of both upper limbs at shoulder level and below, to safely negotiate the busy Rockford thoroughfares." (*Id.*).

The ALJ also noted in his opinion that Plaintiff's wife "has not generally received the type of medical treatment one would expect for a totally disabled individual." (*Id.*). Despite Plaintiff's wife's numerous complaints of disabling symptoms and limiting pain, Plaintiff's wife testified that she has not had any medical treatment since April 1996, approximately ten months prior to the hearing, and she had not taken any pain relieving medications for over a year (*Id.*)

The ALJ next proceeded to determine whether Plaintiff's wife was capable of performing any past relevant work. (Tr. 18). The ALJ focused on Plaintiff's wife's past relevant work as a supervisor of retail clerks at the Union Hall discount store. (*Id.*). This job, as described by Plaintiff's wife in her testimony, required responsibility of accounting for money stored in the safe, filling cash drawers with money for the six cashiers she supervised, recording receipts from the cash registers for bookkeeping purposes, approving checks from customers, calling and verifying charge cards, adding charge receipts, and supervising breaks and lunches for cashiers. (Tr.18-19). Plaintiff's wife performed this job from 1989 through December 1992 and worked for forty hours a week earning roughly $888.00 a month (qualifying as substantial gainful activity). Thus, the ALJ concluded, that under SSR 82-62, Plaintiff's wife's employment experience at Union Hall as a supervisor of retail clerks qualifies as past relevant work. (Tr. 19).

Finally, the ALJ found support for his conclusion that Plaintiff's wife could perform past relevant work as a supervisor of clerks, from vocational expert Mr. Yep's testimony. (*Id.*). Mr. Yep

testified that a person with Plaintiff's wife's RFC could work as a supervisor of retail clerks because such a position is usually done in the American economy at the light exertional grade. (*Id.*). Therefore, the RFC determination by the ALJ is entirely consistent with the performance of a supervisor of retail clerks because it involves no duties or requirements precluded by Plaintiff's wife's limitations.

Plaintiff makes two arguments against the ALJ's ultimate determination. First, the Plaintiff argues that the ALJ's finding that Plaintiff's wife had the RFC to perform light level work is not supported by substantial evidence. (Pl.'s Mot. for Summ. J. at 2). Second, the Plaintiff argues that the ALJ's finding that Plaintiff's wife could perform past relevant work is flawed. (Pl.'s Mot. for Summ. J. at 6). The Magistrate will address each of Plaintiff's arguments.

First, the Magistrate Judge will address Plaintiff's argument that the ALJ's finding that Plaintiff's wife had the RFC to perform light level work is not supported by substantial evidence. To support this argument, Plaintiff argues that the ALJ's credibility determination is flawed. This argument appears to be based on SSR 96-7p, although not specifically cited by Plaintiff. Under SSR 96-7p, the ALJ's determination regarding claimants credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See Zurawski v. Halter*, 245 F. 3d 881, 887 (7th Cir. 2001). In so determining credibility, it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that the "allegations are (or are not) credible." *Id.*

Plaintiff cites the ALJ's assertion that "... allegations of disabling symptoms and limitations

cannot be accepted ... ." (Pl.'s Mot. for Summ. J. at 2). Plaintiff then argues that several factors

cited by the ALJ to support his assertion are mis-characterized. Namely, Plaintiff argues that the

ALJ mis-characterized Plaintiff's wife's theory of disability, (Pl.'s Mot. for Summ. J. at 3), that the

ALJ mis-characterized Plaintiff's wife's daily activities, (*id.* at 4), and the ALJ mis-characterized

Plaintiff's wife's testimony regarding her ability to drive a car. (*Id.*).

Addressing, first, Plaintiff's argument that the ALJ mis-characterized Plaintiff's wife's theory

of disability, the Plaintiff cites the following from the ALJ's opinion: "[Plaintiff's wife] asserts that

she is unable to work because pain causes an inability to use her left shoulder and arm properly to

lift, pull, or push; and she has trouble dressing and doing household chores." (Pl.'s Mot. for Summ.

J. at 3)(citing Tr. 15). However, the ALJ opinion then went on to assert "[Plaintiff's wife] testified,

however, that her right arm is intact." (*Id.* at 3)(citing Tr. 15). Plaintiff argues that Plaintiff's wife's

disability is not based solely on her left arm but rather "upon her inability to sustain any type of

activity, even strictly right handed activity, for longer than approximately 30 minutes, at which time

she requires a rest of approximately 30 minutes." (*Id.*). The Plaintiff argues the only support for the

ALJ's assertion as to her right arm being intact is found from Plaintiff's wife's testimony which

stated as follows:

> Q: So your right arm is intact for lifting but not your left. Is that what you're saying?
> A. Right
> Q. So then you're (sic) left arm then is usable as long as it's from the shoulder down?
> A. Right.

(*Id.* at 4). Drawing from these two questions, the Plaintiff argues the ALJ ignored the totality of

Plaintiff's wife's testimony. (*Id.*). The Magistrate Judge disagrees. Plaintiff's wife, in both her

testimony and her medical records, never made any reference to any pain in her right, dominant,

shoulder. Rather, as stated in the above transcribed testimony, Plaintiff's wife made it clear that her right arm was intact for lifting. Even assuming Plaintiff is correct, Plaintiff's argument is still not persuasive because the vocational expert, Mr. Yep, still found, even with the limitation that Plaintiff's wife could only work for 30 minutes and then require 30 minutes of rest, that Plaintiff's wife "could do some limited sales work, sales clerk work, as long as it doesn't involved stocking." (Tr. 95).

Plaintiff next argues the ALJ mis-characterized Plaintiff's wife's daily activities as a basis for discounting Plaintiff's wife's credibility. (Pl.'s Mot. for Summ. J. at 4). Plaintiff argues activities such as preparing lunch, doing laundry, mopping, dusting and some vacuuming, by their very nature, are neither strenuous nor prolonged. (*Id.*). Additionally, Plaintiff argues that Plaintiff's wife testified that she can only perform those activities for 30 minutes before having to rest for 30 minutes. (*Id.*). It does not appear that the ALJ focused on Plaintiff's wife's daily activities as the sole reason to deny Plaintiff's wife's benefits or to even discount Plaintiff's wife's credibility. Rather, the ALJ noted "[Plaintiff's wife] described daily activities which were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 18). It appears the ALJ looked at the totality of the circumstances, including the objective medical evidence, in discounting Plaintiff's wife's credibility. Besides, if Plaintiff's wife did experience the severe pain in her left arm, as alleged in her testimony, then that means Plaintiff's wife had to use her right arm to perform the above mentioned daily activities and that would further the argument that Plaintiff's right dominate arm is intact.

Lastly, Plaintiff argues the ALJ mis-characterized Plaintiff's wife's testimony regarding the operation of her automobile. (Pl.'s Mot. for Summ. J. at 4). Specifically, Plaintiff cites the

following testimony as support of his argument:

Q. Do you Drive?
A. Yes.
Q. How many miles a week do you average?
A. I would say not over 30.
Q. Does that you do about 30?
A. About 30, yes.
Q. And where do you go?
A. I go to the grocery store.

(Pl.'s Mot. for Summ. J. at 4). The Plaintiff argues, based on the above transcribed testimony, the

ALJ, in his opinion, stated "[Plaintiff's wife] related that she is able to drive an automobile an

average of 30 miles per week to places like the grocery store and bank. This activity is (sic) and of

itself implicatly (sic) requires full use of both upper limbs at shoulder level and below, to safely

negotiate the busy Rockford thoroughfares." (*Id*. at 4-5)(citing Tr. 18). The Plaintiff wants the

Magistrate Judge to take notice that Plaintiff's wife's testimony never mentions that she drove in

Rockford to go to the grocery store or the bank and Plaintiff's wife never stated how many days she

used to go out. Additionally, the Plaintiff wants the Magistrate Judge to take note of the 1997

Rockford City Directory (why not 2002?) and locate Plaintiff's wife's residence which, according

to Plaintiff, is located outside the city limits of Rockford, Illinois. The Magistrate Judge will take

the word of Plaintiff. Also, the Magistrate Judge will agree with Plaintiff that Plaintiff's wife never

testified that she drove in Rockford or how often she used to drive, but the Magistrate Judge believes

Plaintiff has missed the point. Aside from the "safely negotiate the busy Rockford thoroughfares,"

the ALJ appears to be stating that driving requires full use of both hands and arms at the shoulder

level and below. Regardless, as stated above, the operation of an automobile was only one of the

many factors the ALJ considered when assessing Plaintiff's wife's credibility. Thus, the Magistrate

Judge will not disturb the deference given to the ALJ. *See Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)(stating "[w]e have repeatedly stated that an ALJ's credibility determination will not be disturbed unless it is patently wrong."); *Herron v. Shalala*, 19F.3d 329, 335 (7th Cir. 1994)(stating "[s]ince the ALJ is in the best position to observe witnesses, we usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong.")

Lastly, the Magistrate Judge addresses Plaintiff's argument that the ALJ's finding that Plaintiff's wife could perform past relevant work is flawed. Plaintiff first argues that the RFC determined by the ALJ cannot stand because it is based upon "an incomplete functional capacity determination which is tainted by the flawed credibility assessment ... ." (Pl.'s Mot. for Summ. J. at 6). Having already determined above that the ALJ credibility determination is not flawed, the Magistrate Judge will not address this argument and instead move on.

Next, Plaintiff argues that the ALJ did not fully take into consideration Mr. Yep's testimony. Specifically, Plaintiff directs the Magistrate Judge to the hypothetical poised by Plaintiff's counsel where counsel added the restriction that the individual could not perform repetitive activities with the left hand regardless of weight involved throughout an eight hour day for longer than 30 minutes continuously. (Pl.'s Mot. for Summ. J. at 6). In response to that limitation, Mr. Yep, the vocational expert, found that the individual could still work as a sales clerk or a customer service clerk. However, Plaintiff's counsel further limited the hypothetical again to a bi-manual restriction limiting repetitive activities regardless of weight to alternating 30 minute periods over an eight hour period, at which point Mr. Yep testified that no work could be performed with such limitations. (Tr.95-97). Again, it appears Plaintiff is trying to argue that Plaintiff's wife was unable to use either extremity

when the medical evidence and Plaintiff's wife's own testimony supports the contrary. While the Magistrate Judge agrees with Plaintiff and Mr. Yep that there are probably no jobs for an individual with bi-manual restrictions who can only work for periods of 30 minutes, such restrictions do not apply to Plaintiff's wife.

Substantial evidence exists to support the ALJ's finding that Plaintiff's wife could have performed past relevant work and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Four of the Analysis is affirmed. Because the Plaintiff's wife's residual functional capacity allowed her to return to past relevant work, she is found not disabled and there is no need to move on to Step Five.

## VII.    CONCLUSION

For the reasons stated above, the ALJ's decision to deny benefits to Plaintiff's wife is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**DATE:** 11/18/02